AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

The Cellular Devices More Fully Described in Attachment A

)
)
)
)
)
)

Case No.    1:21-mj-927

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 846 and 841(a)(1) | Conspiracy to Possess with Intent to Distribute and Distribution a Controlled Substance |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Anthony C. Ott*

*Applicant's  signature*

Anthony C. Ott, Special Agent F.B.I.

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

__via FaceTime video__ *(specify reliab...*

Date:   __Dec 3, 2021__

*Karen L. Litkovitz*
**Karen L. Litkovitz**
**United States Magistrate Judge**

City and state:   Cincinnati, Ohio

## <u>ATTACHMENT A</u>

PROPERTY TO BE SEARCHED

The property to be searched is listed below.  The devices are currently located in a secure evidence storage at FBI Cincinnati, 2012 Ronald Reagan Drive, Cincinnati, Ohio, 45236.

a. Cell phone, an Apple iPhone 12 Pro Max, Model A2342, IMEI: 350777733537632.

b. Cell phone, and an Apple iPhone, SE 2020 model black in color with no case, no other visible identifiers.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.          All records and information on the Devices described in Attachment A that relate to violations of 21 U.S.C. §§ 841 and 846 (possession with intent to distribute a controlled substance and conspiracy to commit a Title 21 offense); by Roderick SMITH and members of the ROBERSON DTO and others yet unknown occurring in or after 2018 through the present, including but not limited to communications, photographs, videos, cell phone applications, records, and other data about the following:

    a.   Any and all controlled substances (as defined under Title 21, United States Code, § 812) possessed by Roderick Smith , members of the ROBERSON DTO and others yet unknown.

    b.   lists of customers and related identifying information;

    c.   types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    d.   any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    e.   all bank records, checks, credit card bills, account information, and other financial records.

    f.   Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

    g.   Paraphernalia associated with the manufacture, distribution, sale, import, export, storage, conversion, preparation for sale and use of any controlled

substances, including scales, measuring devices, bottles, balloons, baggies, plastic wrap, plastic envelopes, film canisters and cutting, conversion, and adulteration agents.

h. Records showing evidence of importing, smuggling, and distributing drugs, including books, ledgers and diaries, address books and lists, buyer and seller lists, notebooks, IOU's, spreadsheets, rolodexes, telephone bills, telephone answering pads, bank and financial records, wire transfer records, express consignment mailing labels (including Federal Express, DHL, U.S. Postal Express Mail, UPS, and other similar labels), evidence of offsite storage (such as storage locker receipts and safety deposit box rental records and keys), documents showing domestic or international travel (such as airline tickets, itineraries, passports, and the like), and receipts showing imports or exports (such as shipper's export declarations, bills of lading, invoices, tax identification number paperwork, and other similar documents).

i. Currency (whether U.S. or foreign) and financial instruments, including travelers checks, bonds, stock certificates, cashier's checks, certificates of deposit, and money orders, derived from the sale of controlled substances in violation of Title 21, United States Code, § 841 and money wrappers, rubber bands, money containers, and money counting machines.

j. Precious metals, jewelry, art, or other high-value items that could be obtained with the proceeds of the sales of controlled substances.

2

k. Any and all records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, art, or other high-value items that could be obtained with the proceeds of the sales of controlled substances.

l. Any boxes, bags, briefcases, suitcases, containers, or other items that could be used to mail, carry, import, export, smuggle, or transport marijuana or any other controlled substances.

m. Photographs (both paper and digital form) and video and audio recordings which document an association with other co-conspirators and/or display drug trafficking methods, narcotics, firearms, or money and proceeds from narcotics transactions.

n. All records, documents, and materials showing control, possession, custody, dominion or other indicia of occupancy over physical premises, including but not limited to:    personal mail, checkbooks, personal identification, personal effects, notes, other correspondence, utility and other bills, internet service provider documents, letters, rent receipts, mortgage and loan documents, financial documents, vehicle registration information or ownership warranties and keys.

o. Any and all electronic or communication devices including, but not limited to, cellular telephones, smart phones, portable electronic devices such as tablet computers, laptops, iPads or electronic storage media, and other electronic or communication devices which could be used to facilitate drug trafficking;

p. Firearms and ammunition;

3

q. Firearms accessories, such as ammunition, ammunition magazines, silencers, gun cases, magazines and spare parts;

r. Firearms source records, including lists of prices, correspondence, notation logs, receipts, journals, books, telephone records, telephone bills, address books, bank statements, and other documents or devises noting the price, quantity, dates, and/or times when firearms were purchased possessed, transferred, distributed or sold;

s. Photographs, video and audio recordings, text messages, chats, emails and other communications (and associated contact information), in electronic or other form, related to the possession, acquisition or transfer of firearms, firearms parts and accessories, or ammunition;

t. Firearms boxes, manuals, and receipts or other paperwork related to firearms transactions;

u. United States currency or other items of value representing the proceeds of firearms trafficking and/or drug trafficking;

v. Documents pertaining to the importation of firearms and/or ammunition and proceeds derived from the sale therefrom, including invoices, shipping labels, tracking numbers, boxes, and envelopes.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

IN THE UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF OHIO

IN THE MATTER OF THE SEARCH OF:

APPLE IPHONE 12 PRO MAX, MODEL
A2342, IMEI: 350777733537632

AN APPLE IPHONE, SE 2020 MODEL
BLACK IN COLOR WITH NO CASE (NO
OTHER VISIBLE IDENTIFIERS)

ALL CURRENTLY LOCATED AT SECURE
EVIDENCE STORAGE AT THE FBI
CINCINNATI FIELD OFFICE, LOCATED
AT 2012 RONALD REAGAN DRIVE,
CINCINNATI, OHIO 45236.

Case No. ___1:21-mj-927_____

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Anthony C. Ott, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) assigned to the Cincinnati, Ohio Field Office Division, and have been so employed since October 2000.  As a Special Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. The Attorney General of the United States has empowered me with Title 21 authority, which authorizes me to seize property, conduct search warrants, and make arrests of persons for violations of the Controlled Substances

Act.

3.     I am currently assigned to investigate matters involving violent crimes, violent crimes against children, organized crime, criminal enterprises, and narcotics to include the unlawful possession, possession with intent to distribute, and actual distribution of controlled substances.  I have participated in the preparation and execution of Federal arrest and search warrants related to numerous criminal offenses, including those involved in the current investigation, in my position as a Special Agent.  I have also been involved with the analysis of pen registers, the monitoring of Title III wire intercepts, and the installation and monitoring of tracking devices for vehicles in relation to narcotics investigations. Further, I have been the affiant and obtained numerous Federal warrants for the cell phone data location of fugitives and subjects under investigation by the FBI.

4.     In my experiences I have had the opportunity to monitor, listen, and review transcripts pertaining to communications which involved the trafficking of illegal narcotics by persons who attempted to thwart law enforcement by speaking in some sort of coded language.  I have also participated in numerous post arrest and proffer interviews of individuals with knowledge of illegal drug trafficking that had been involved in using coded language and were familiar with day to day operations utilized by those involved in the illegal trafficking of narcotics.   Through these interviews and other investigative experiences, I have gained knowledge regarding the various methods, techniques, codes, and/or jargon utilized by illegal drug traffickers in the course of conducting their criminal activities.

5.     In addition, I have utilized confidential informants, pen registers, toll records, physical surveillances, and electronic surveillances in the process of my investigations to further my knowledge regarding the operations of those involved in illegal narcotics distribution.  I have

2

further been the affiant on Federal search warrants, have testified in Grand Jury proceedings, and have written reports during the course of conducting investigations.

6.      Through my training, experiences, and communications with other experienced agents and officers who conduct drug investigations, I have become familiar with methods used by drug traffickers to import, transport, store, collect, and safeguard illegal narcotics. Additionally, my training and experiences have given me knowledge regarding the methods used by drug traffickers to communicate with each other, to launder drug proceeds, and to thwart efforts by law enforcement to detect their illegal activities. I also have gained intelligence through my experiences, and through conversations with others who have conducted drug-related investigations, in regard to methods by which drug traffickers package, prepare, and distribute narcotics.

7.      Facts set forth in this complaint are based on personal knowledge derived from my participation in this investigation and upon information presented to me by other law enforcement officers involved in this case to include fellow agents of the DEA, Ohio Bureau of Criminal Investigation, the Drug Abuse and Reduction Task Force (DART), Hamilton County Regional Enforcement Narcotics Unit (RENU), Cincinnati Police Department (CPD), Hamilton County Probation Office, Butler County Undercover Regional Narcotics Unit (BURN) and other law enforcement agencies. The sources of my information and beliefs include: (1) oral and written reports about this and other investigations which I have received from fellow law enforcement agencies; (2) physical and electronic surveillance conducted by Special Agents of the FBI and/or other law enforcement authorities which have been reported to me either directly or indirectly; (3) interviews of subjects, witnesses, victims, and confidential sources; (3) search warrants of residences, vehicles, and cell phones; and (3) law enforcement controlled drug buys.

3

8.     Since this affidavit is being submitted for the limited purpose of establishing probable cause authorizing search and seizure, I have not included each and every fact and circumstance I am aware of.  I have set forth only those facts which I believe are necessary to establish such probable cause.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

9.     The property to be searched, an Apple iPhone 12 Pro Max, Model A2342, IMEI: 350777733537632, and an Apple iPhone, SE 2020 model black in color with no case (no other visible identifiers), are currently in secure evidence storage at the FBI Cincinnati Field Office, located at 2012 Ronald Reagan Drive, Cincinnati, Ohio 45236.

10.     The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

11.     In or around 2018, FBI Cincinnati became aware through multiple sources of information that Steffen ROBERSON a/k/a "Worm" was running one of the largest heroin/fentanyl drug trafficking organizations located in the greater Cincinnati, Ohio area. In or around 2018, FBI Cincinnati had a separate investigation into a high-level Cincinnati, Ohio drug trafficker that included a court authorized Title III wiretap. Several of the recorded telephone calls were to Anthony ROBERSON that included what appeared to be coded drug trafficking language about meeting up. The Title III subject would ask ANTHONY ROBERSON when ROBERSON would be in town and how to meet up with him. FBI Cincinnati consulted with several federal and state law enforcement partners who also provided corroborating information about the ROBERSON DTO.

4

12.     Sources of information have advised that the ROBERSON DTO members work together coordinating the distribution of narcotics including heroin/fentanyl, cocaine, methamphetamine, and marijuana. The ROBERSON DTO is known to purchase narcotics from numerous sources of supply and distribute them throughout the ROBERSON DTO.  Over twenty state and federal search warrants have been executed since 2018 on ROBERSON DTO members' drug trafficking residences where large quantities of fentanyl and loaded firearms have been routinely recovered.

13.     During their investigation, investigators identified SMITH as a member of the ROBERSON DTO who sold fentanyl.  In late 2019 and early 2020, confidential informant(s) made multiple controlled purchases from SMITH at the direction of law enforcement.  SMITH sold informant(s) fentanyl in exchange for U.S. Currency.  SMITH regularly used cell phones to arrange for the fentanyl transactions.

14.     In August 2021, a reliable confidential informant[1] made a controlled purchase of fentanyl from SMITH.  Previously, the confidential informant identified SMITH's phone number as 314-516-3256 and previous number as 513-809-3164.  In August 2021, at the direction of law enforcement, the confidential informant called SMITH using Apple Facetime to arrange for the purchase of fentanyl from SMITH.  SMITH agreed to sell the informant fentanyl.  SMITH's phone location information, obtained through a court authorized search warrant, showed that SMITH was at 482 Pedretti Avenue before the controlled buy.  SMITH met the informant at a pre-determined meeting location and sold the informant fentanyl in exchange for pre-recorded

---

[1] The confidential informant is current charged with violation so of 21 U.S.C. §§ 841(a)(1) and 846 and is cooperating with law enforcement in the hopes s/he will receive a lower sentence.  The confidential informant has previously been convicted of Drug Trafficking (2008 and 2013).

U.S. Currency. The fentanyl SMITH sold the informant tested positive at the lab for acetyl fentanyl, benzyl fentanyl, fentanyl, and cocaine.

15. From August 2021 through September 2021, investigators continued investigating SMITH and his drug trafficking activity. Based on the investigation, investigators believe that SMITH was working with Jason BRADFORD to sell fentanyl in the Cincinnati, Ohio area. On August 30, 2021, agents conducted physical surveillance at two residences associated with BRADFORD located on Wayne Avenue. Agents saw SMITH arrive on Wayne Avenue and back into the driveway at one of the two residences. SMITH exited his vehicle and entered 10163 Wayne Ave. After entering, SMITH entered and exited 10163 Wayne multiple times gathering unknown items from his trunk. Shortly thereafter, agents saw BRADFORD arrive and enter 10163 Wayne Ave. During surveillance, agents saw multiple vehicles coming and going from the residences. Based on my training and experience, this activity is consistent with drug trafficking.

16. On November 15, 2021, United States the Honorable Magistrate Judge Stephanie K. Bowman signed Arrest Warrants for thirteen members of the ROBERSON DTO, that charged them with Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances. Jerome NEWTON, Jimmy DANIEL, Roderick SMITH, David HAMLER, Donald FAIRBANKS, and Devon PRICE among the 13 members who arrest warrants were issued for and those defendants were taken into custody on November 16, 2021.

17. Also on November 15, 2021, Judge Bowman signed a search warrant for residences associated with the ROBERSON DTO to include: 482 Pedretti Avenue, Apartment 10, Cincinnati, Ohio, which is the residence where Roderick SMITH was residing.

18. On November 16, 2021, agents executed the search warrant at 482 Pedretti Avenue, Apartment 10, Cincinnati, Ohio, a residence where SMITH was living. SMITH was present at the time the search warrant was executed and was arrested. Agents executing the search warrant also seized the following electronic devices from SMITH's bedroom at 482 Pedretti Avenue, Apartment 10: Apple iPhone SE 2020 model, black in color, no case (no further visible identifiers) and an Apple iPhone 12 Pro Max, Model A2342, IMEI 350777733537632.

19. I believe, for the reasons I described above, as well as for the additional reasons I give below, that the Devices will contain evidence related to the ROBERSON DTO's and SMITH's drug trafficking and conspiracy to commit drug trafficking. Based on my training and experience, as well as my discussions with other law enforcement agents, I know the following about drug trafficking:

20. Drug dealers often maintain documents pertaining to the possession, importation, exportation, and/or distribution of controlled substances and illegal proceeds, including invoices, shipping labels, tracking numbers, boxes, and envelopes at their residences, stash houses, and/or in their vehicles where they are available for reference and concealed from law enforcement; and it is common to find photos or other records relating to these items on an electronic device used;

21. It is also common to find on drug dealers' smart phones photos or other records relating to the following common practices of drug dealers:

   a. Drug dealers keep books, receipts, notes, ledgers and other forms of records specifically relating to their drug distribution activities. Because drug dealers often "front" drugs to their customers – that is, sell the drugs on credit – or receive drugs from their suppliers on credit, such documentation is necessary to keep track of the amounts paid and owed with respect to their customers and

7

suppliers.  These ledgers are more commonly known as "pay/owe sheets" and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets, and are frequently encoded in order to protect those involved.  Drug dealers often keep such records on their person or in their residences, stash houses, vehicles; and/or in their cellular devices.

b. Drug dealers often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money to various points within the United States.  They do so, at least in part, due to the convenience of the service and the availability of related internet and phone tracking services, speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another.  They often use hand-written airbills, drop the packages near closing time, pay for such services in cash and utilize false or nominee names, addresses, and/or telephone numbers when using such services in order to further insulate themselves from detection by law enforcement.  Drug dealers frequently maintain records relating to their use of these services, such as receipts, on their cellular devices.

c. Drug dealing is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package and deliver the drugs and persons to launder the drug proceeds.  These persons frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses, sometimes encoded and sometimes not encoded, for the purpose of contacting their suppliers,

8

customers, transporters, and others involved in their illicit drug distribution activities. These records are typically maintained on their person or in their residences, stash houses, and/or vehicles, so they are readily available in order to efficiently conduct their drug dealing business. Moreover, such records are often stored electronically within the memory of telephones, computers, and/or personal digital assistants such as iPhone and Blackberry devices;

d.   Drug dealers often use cellular telephones, satellite telephones, pagers and text messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, and/or personal digital assistants such as iPhone and Blackberry devices in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. Drug dealers often keep these items on their person or in their residences, stash houses, businesses, and/or vehicles where they are readily available;

e.   Drug dealers often travel by car, bus, train, or airplane, both domestically and to and/or within foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, or to transport drugs or drug proceeds. Documents relating to such travel, such as calendars, travel itineraries, maps, airline ticket and baggage stubs, frequent use club membership information and records associated with airlines, rental car companies, and/or hotels, airline, hotel and rental car receipts, credit card bills and receipts, photographs, videos, passports, and visas, are often maintained by drug dealers in their cellular devices;

9

f. Drug dealers frequently take, or cause to be taken, photographs and/or videos of themselves, their criminal associates, their real and personal property, their weapons, and their drugs; and such items are often stored on their person, in their residences, and/or vehicles; these photographs and/or videos are often taken and stored on their electronic devices.

22. The Devices are currently in the lawful possession of the FBI. It came into the FBI's possession in the following way: the Devices were taken during the execution of a search warrant. Therefore, while the FBI might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

23. The Device is currently in secure evidence storage at the FBI Cincinnati Field Office, located at 2012 Ronald Reagan Drive, Cincinnati, Ohio 45236. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the FBI.

## TECHNICAL TERMS

24. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call

10

log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media.

11

Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data

and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

25. Based on my training, experience, and research, **[[**and from consulting the manufacturer's advertisements and product technical specifications available online at

13

www.apple.com. I know that the Devices have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

27. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

  a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

  b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

  c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw

conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

28.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

29.  *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

30.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

## REQUEST FOR SEALING

31.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

*Anthony C. Ott*

ANTHONY C. OTT
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on December 3, 2021:

Karen L. Litkovitz
United States Magistrate Judge

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The property to be searched is listed below.  The devices are currently located in a secure evidence storage at FBI Cincinnati, 2012 Ronald Reagan Drive, Cincinnati, Ohio, 45236.

      a. Cell phone, an Apple iPhone 12 Pro Max, Model A2342, IMEI: 350777733537632.

      b. Cell phone, and an Apple iPhone, SE 2020 model black in color with no case, no other visible identifiers.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

1.      All records and information on the Devices described in Attachment A that relate to violations of 21 U.S.C. §§ 841 and 846 (possession with intent to distribute a controlled substance and conspiracy to commit a Title 21 offense); by Roderick SMITH and members of the ROBERSON DTO and others yet unknown occurring in or after 2018 through the present, including but not limited to communications, photographs, videos, cell phone applications, records, and other data about the following:

     a.  Any and all controlled substances (as defined under Title 21, United States Code, § 812) possessed by Roderick Smith , members of the ROBERSON DTO and others yet unknown.

     b.  lists of customers and related identifying information;

     c.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

     d.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

     e.  all bank records, checks, credit card bills, account information, and other financial records.

     f.  Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

     g.  Paraphernalia associated with the manufacture, distribution, sale, import, export, storage, conversion, preparation for sale and use of any controlled

substances, including scales, measuring devices, bottles, balloons, baggies, plastic wrap, plastic envelopes, film canisters and cutting, conversion, and adulteration agents.

h. Records showing evidence of importing, smuggling, and distributing drugs, including books, ledgers and diaries, address books and lists, buyer and seller lists, notebooks, IOU's, spreadsheets, rolodexes, telephone bills, telephone answering pads, bank and financial records, wire transfer records, express consignment mailing labels (including Federal Express, DHL, U.S. Postal Express Mail, UPS, and other similar labels), evidence of offsite storage (such as storage locker receipts and safety deposit box rental records and keys), documents showing domestic or international travel (such as airline tickets, itineraries, passports, and the like), and receipts showing imports or exports (such as shipper's export declarations, bills of lading, invoices, tax identification number paperwork, and other similar documents).

i. Currency (whether U.S. or foreign) and financial instruments, including travelers checks, bonds, stock certificates, cashier's checks, certificates of deposit, and money orders, derived from the sale of controlled substances in violation of Title 21, United States Code, § 841 and money wrappers, rubber bands, money containers, and money counting machines.

j. Precious metals, jewelry, art, or other high-value items that could be obtained with the proceeds of the sales of controlled substances.

2

k. Any and all records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, art, or other high-value items that could be obtained with the proceeds of the sales of controlled substances.

l. Any boxes, bags, briefcases, suitcases, containers, or other items that could be used to mail, carry, import, export, smuggle, or transport marijuana or any other controlled substances.

m. Photographs (both paper and digital form) and video and audio recordings which document an association with other co-conspirators and/or display drug trafficking methods, narcotics, firearms, or money and proceeds from narcotics transactions.

n. All records, documents, and materials showing control, possession, custody, dominion or other indicia of occupancy over physical premises, including but not limited to: personal mail, checkbooks, personal identification, personal effects, notes, other correspondence, utility and other bills, internet service provider documents, letters, rent receipts, mortgage and loan documents, financial documents, vehicle registration information or ownership warranties and keys.

o. Any and all electronic or communication devices including, but not limited to, cellular telephones, smart phones, portable electronic devices such as tablet computers, laptops, iPads or electronic storage media, and other electronic or communication devices which could be used to facilitate drug trafficking;

p. Firearms and ammunition;

3

q. Firearms accessories, such as ammunition, ammunition magazines, silencers, gun cases, magazines and spare parts;

r. Firearms source records, including lists of prices, correspondence, notation logs, receipts, journals, books, telephone records, telephone bills, address books, bank statements, and other documents or devises noting the price, quantity, dates, and/or times when firearms were purchased possessed, transferred, distributed or sold;

s. Photographs, video and audio recordings, text messages, chats, emails and other communications (and associated contact information), in electronic or other form, related to the possession, acquisition or transfer of firearms, firearms parts and accessories, or ammunition;

t. Firearms boxes, manuals, and receipts or other paperwork related to firearms transactions;

u. United States currency or other items of value representing the proceeds of firearms trafficking and/or drug trafficking;

v. Documents pertaining to the importation of firearms and/or ammunition and proceeds derived from the sale therefrom, including invoices, shipping labels, tracking numbers, boxes, and envelopes.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The property to be searched is listed below. The devices are currently located in a secure evidence storage at FBI Cincinnati, 2012 Ronald Reagan Drive, Cincinnati, Ohio, 45236.

        a. Cell phone, an Apple iPhone 12 Pro Max, Model A2342, IMEI: 350777733537632.

        b. Cell phone, and an Apple iPhone, SE 2020 model black in color with no case, no other visible identifiers.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records and information on the Devices described in Attachment A that relate to violations of 21 U.S.C. §§ 841 and 846 (possession with intent to distribute a controlled substance and conspiracy to commit a Title 21 offense); by Roderick SMITH and members of the ROBERSON DTO and others yet unknown occurring in or after 2018 through the present, including but not limited to communications, photographs, videos, cell phone applications, records, and other data about the following:

   a.   Any and all controlled substances (as defined under Title 21, United States Code, § 812) possessed by Roderick Smith , members of the ROBERSON DTO and others yet unknown.

   b.   lists of customers and related identifying information;

   c.   types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   d.   any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   e.   all bank records, checks, credit card bills, account information, and other financial records.

   f.   Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

   g.   Paraphernalia associated with the manufacture, distribution, sale, import, export, storage, conversion, preparation for sale and use of any controlled

substances, including scales, measuring devices, bottles, balloons, baggies, plastic wrap, plastic envelopes, film canisters and cutting, conversion, and adulteration agents.

h. Records showing evidence of importing, smuggling, and distributing drugs, including books, ledgers and diaries, address books and lists, buyer and seller lists, notebooks, IOU's, spreadsheets, rolodexes, telephone bills, telephone answering pads, bank and financial records, wire transfer records, express consignment mailing labels (including Federal Express, DHL, U.S. Postal Express Mail, UPS, and other similar labels), evidence of offsite storage (such as storage locker receipts and safety deposit box rental records and keys), documents showing domestic or international travel (such as airline tickets, itineraries, passports, and the like), and receipts showing imports or exports (such as shipper's export declarations, bills of lading, invoices, tax identification number paperwork, and other similar documents).

i. Currency (whether U.S. or foreign) and financial instruments, including travelers checks, bonds, stock certificates, cashier's checks, certificates of deposit, and money orders, derived from the sale of controlled substances in violation of Title 21, United States Code, § 841 and money wrappers, rubber bands, money containers, and money counting machines.

j. Precious metals, jewelry, art, or other high-value items that could be obtained with the proceeds of the sales of controlled substances.

2

k. Any and all records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, art, or other high-value items that could be obtained with the proceeds of the sales of controlled substances.

l. Any boxes, bags, briefcases, suitcases, containers, or other items that could be used to mail, carry, import, export, smuggle, or transport marijuana or any other controlled substances.

m. Photographs (both paper and digital form) and video and audio recordings which document an association with other co-conspirators and/or display drug trafficking methods, narcotics, firearms, or money and proceeds from narcotics transactions.

n. All records, documents, and materials showing control, possession, custody, dominion or other indicia of occupancy over physical premises, including but not limited to: personal mail, checkbooks, personal identification, personal effects, notes, other correspondence, utility and other bills, internet service provider documents, letters, rent receipts, mortgage and loan documents, financial documents, vehicle registration information or ownership warranties and keys.

o. Any and all electronic or communication devices including, but not limited to, cellular telephones, smart phones, portable electronic devices such as tablet computers, laptops, iPads or electronic storage media, and other electronic or communication devices which could be used to facilitate drug trafficking;

p. Firearms and ammunition;

3

q. Firearms accessories, such as ammunition, ammunition magazines, silencers, gun cases, magazines and spare parts;

r. Firearms source records, including lists of prices, correspondence, notation logs, receipts, journals, books, telephone records, telephone bills, address books, bank statements, and other documents or devises noting the price, quantity, dates, and/or times when firearms were purchased possessed, transferred, distributed or sold;

s. Photographs, video and audio recordings, text messages, chats, emails and other communications (and associated contact information), in electronic or other form, related to the possession, acquisition or transfer of firearms, firearms parts and accessories, or ammunition;

t. Firearms boxes, manuals, and receipts or other paperwork related to firearms transactions;

u. United States currency or other items of value representing the proceeds of firearms trafficking and/or drug trafficking;

v. Documents pertaining to the importation of firearms and/or ammunition and proceeds derived from the sale therefrom, including invoices, shipping labels, tracking numbers, boxes, and envelopes.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

4

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.